AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL

TIMOTHY D. LEULIETTE,

    Claimant/Counterclaim Respondent,

vs.

                                Case No. 01-16-0000-5692

VISTEON CORPORATION,

    Respondent/Counterclaimant.
_____/

| CROTTY & SCHILTZ, LLC | JONES DAY |
|---|---|
| By:    Sean B. Crotty | By:    Jeffrey J. Jones (P80231) |
|         Eugene J. Schiltz |         Brittany D. Parling (P78870) |
| Attorney for Timothy D. Leuliette | Attorney for Visteon Corporation |
| 120 N. LaSalle, Suite 2000 | 150 West Jefferson Avenue, Suite 2100 |
| Chicago, IL 60602 | Detroit, MI 48226 |
| Phone No.: 312.606.8626 | Phone No.: 313.733.3939 |
| Fax No.: 312.444.1028 | Fax No.: 313.230.7997 |
| Email: scrotty@crottylaw.com | Email: jjjones@jonesday.com |
|        gschiltz@crottylaw.com |        bparling@jonesday.com |
| |        jrwilliams@jonesday.com |

## AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated by the parties in accordance with Paragraph 19 of the Visteon Corporation Employment Agreement (the "Employment Agreement") by and between Timothy D. Leuliette ("Leuliette") and Visteon Corporation ("Visteon") and in particular the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association, having been duly sworn, and having heard and/or reviewed the proofs, the allegations of the parties, the exhibits submitted, the deposition transcripts submitted in lieu of testimony, the testimony presented by the parties and the post-hearing submissions states as follows as the Arbitrator's Award:

1. In September of 2012, Leuliette and Visteon entered into the Employment Agreement which had four exhibits, including a Restricted Stock Unit Grant Agreement, a Performance Stock Unit Grant Agreement and a Change in Control Agreement. This arbitration did not involve the Change in Control Agreement but Leuliette's claim included claims for compensation claimed to be earned but not paid under the Restricted Stock Unit Grant Agreement ("RSUG") and the Performance Stock Unit Grant Agreement ("PSUG"). Prior to September of 2012, Leuliette sat on the Board of Visteon. Leuliette began his term as CEO of Visteon that had recently emerged from Chapter 11 bankruptcy with a stock price at barely $27 a share. At that time, Visteon was faced with many acknowledged problems, both internal and external. Leuliette was known as a merger and acquisition "expert". During his term, Visteon's stock rose sevenfold by 2015. In June of 2014, Leuliette and Visteon agreed to amend his Employment Agreement. In January of 2015, after touring the consumer electronics show, the Board of Directors of Visteon, in executive session, discussed changing the focus of the company to a more technology driven operating company. As a result, they thought it was time for its then Chief Executive Officer (Leuliette) to depart and that Visteon would form an executive search committee to engage in the process of searching, identifying and recommending to the full Board of Directors candidates for the office of CEO. Thus, it was decided and agreed upon in January of 2015 that the relationship between Leuliette and Visteon would come to an end. In March of 2015, the Board of Directors approved a resolution stating "The Board believes that the existing CEO's performance and decision making during the difficult period of Visteon's restructuring to a more technology driven operating company have been exceptional and, in particular, the existing CEO has made and executed difficult decisions in a professional manner that have resulted in tremendous increases in stockholder value." That same resolution also

2

provided that Leuliette would continue to be responsible for the operation of Visteon in the normal course of business unless otherwise directed by the Board until a successor CEO was hired. Thus, the undersigned finds that Visteon benefitted greatly under Leuliette's leadership.

2. While the search was continuing, a schism apparently developed between the Visteon Board of Directors and Leuliette leading up to Board Chairman Francis Scricco, with the approval of the Board of Directors, advising Leuliette orally in the late evening of June 8, 2015 that he was being terminated. A written notification of same, dated June 8, 2015, was forwarded to Mr. Leuliette at 12:25 a.m. on June 9, 2015. That letter provided that he would have 60 days to execute the form of release attached to the Employment Agreement and return it and that Leuliette would be entitled to the severance and benefits set forth in a schedule to be provided prior to his execution of the Release. No such schedule of benefits was provided and no release was executed. Rather, Leuliette resigned as requested on June 10, 2015, which resignation was accepted on behalf of Visteon. This June 8/9th termination was one without cause. Paragraph 7(d) of the Employment Agreement provides that a "without cause" termination occurred "immediately upon **written notice** by the company to the employee of an involuntary termination without cause (other than for death or disability)." Based upon the testimony and written evidence, it is the finding of the undersigned Arbitrator that Leuliette's termination from Visteon occurred on June 9, 2015. Furthermore, the undersigned Arbitrator finds that inasmuch as Visteon did not provide a schedule of severance and benefits he was excused from providing the execution and delivery of the release attached to the employment contract. Therefore, the schedule of benefits had to be identified and thereafter agreed upon.

3

3. Prior to June 11, 2015, Visteon engaged the Kaye Scholer law firm to investigate certain acts and/or activities in which Leuliette is alleged to have engaged in while serving as CEO, many of which the Board or others at Visteon had knowledge of.

4. As early as January 2015 and clearly by March of 2015, Visteon knew that they were separating from Leuliette and had opportunities to investigate and/or monitor Leuliette's activities and/or actions in order to determine whether that separation would be with or without cause. The definition of cause in Paragraph 7(c) of the Employment Agreement provided for **written notice** by the company to the employee of a termination for cause. That section of Employment Agreement then went on to identify six items which would constitute "cause" for termination. These included conviction of or pleading guilty to crime, fraud, embezzlement, misappropriation of funds, gross or willful misconduct resulting in substantial loss to the company or damage to the company's reputation, material and willful violation of any reasonable rules, regulations, policies, directions or restrictions of the company, a willful failure or refusal to carry out reasonable and lawful directions of the Board and, finally, a willful and material breach of any provision of the Employment Agreement. Paragraph 7(c) of the Employment Agreement further indicates that "no act or omission to act by the employee shall be willful if conducted in good faith and with a reasonable belief that such act or omission was in the best interest of the company." The Employment Agreement also requires that the employee be given written notice detailing the specific cause event, an opportunity to appear before the Board to refute such a finding (with assistance of counsel), and a period of 30 days following such appearance to cure such event (if susceptible to cure) to the satisfaction of the Board. Based upon the aforesaid, the undersigned Arbitrator finds that Leuliette was terminated by Visteon prior to the receipt of any notification of the basis for a termination for cause which was being invoked by the company,

4

and, therefore, the right or ability on the part of Leuliette to cure was taken away by the Board to his detriment.

5. Under cover letter dated October 2, 2015, approximately four months after his initial termination, Leuliette, through counsel, was advised of five items which the Board believed were grounds to terminate Leuliette's employment for cause. These items included (a) spending significant amount of time away from the company's headquarters thereby not devoting all of his business time to the affairs of the company, (b) remaining active in the operation of Leuliette Partners and American Music Resort Properties ("AMR"), (c) that Laurie Ingram was also employed by Leuliette Partners and participated in AMR during business hours with Ms. Ingram also acting as Leuliette's personal assistant thereby misappropriating Visteon funds and/or constituting a breach of fiduciary duty, (d) engaging in discussions concerning the potential sale of the electronics division of Visteon without directly involving the Board or carrying out the Board's lawful and reasonable directives not to do, and (e) obtaining reimbursement for expenses for the Leuliette family trip to Israel. The Board then invited Leuliette, together with counsel, to come before its members to respond to the findings of the Kaye Scholer's investigation. Counsel for Leuliette responded by indicating that they wished to be provided with the details to support the claims and then would be willing to appear after receipt of that information. No additional information was provided. This was followed by Kaye Scholer's November 3, 2015 letter indicating that after receipt of letters of October 21, 2015 and October 29, 2015 from counsel for Leuliette, the Board moved forward and made a formal finding based upon those very same items that his termination would be for "cause" based on the alleged "after acquired" information. This was reiterated in correspondence of December 3, 2015.

6. After reviewing each of the items identified in the aforementioned Kaye Scholer correspondence, listening to the testimony and reviewing the exhibits, it is the undersigned Arbitrator's finding that Leuliette's participation in AMR and Leuliette Partners was not a breach of the Employment Agreement. His participation was minimal and his participation therein was known prior taking the position as CEO. Furthermore, Paragraph 1(b) provided that he could serve on any pre-existing board memberships as of the effective date of the Agreement without the necessity of any written approval of the Board. AMR was a limited liability company that did not have a formal Board. His involvement was consistent with being a Board of Directors member serving as a managing member and thus it is a distinction without a difference. Leuliette Partners was merely the entity to service Leuliette and his family's personal needs and activities. With regard to Leuliette's trip to Israel, the undersigned Arbitrator finds that it also did not rise to a justification of a for cause termination. The appropriate remedy for an inappropriate payment reimbursement under Visteon's policy would be to request repayment of any of the improper or inappropriate payments. No such request was ever made. However, the largest portion of this expense related to security expenses, a program that Leuliette was entitled to under his Employment Agreement. This "perk", as explained, included security for his entire party or family and himself whether or not for personal or business reasons. Thus, these were not sufficient to justify a for cause termination.

7. The undersigned Arbitrator also finds that Leuliette spending time at his home in Florida does not rise to the level to support a for cause termination. Visteon knew of the location of Leuliette's home when he moved from Michigan to Florida. The fact that he had sought residential status in Florida lends no further weight to support a for cause termination. Many executives and entrepreneurs do this for tax and estate planning reasons. The undersigned

6

Arbitrator also believes that Visteon did not demonstrate that Leuliette acted in a willful or material manner in order to breach his contract by the location of his residence. The undersigned Arbitrator heard a significant amount of testimony with regard to discussions concerning the potential sale of the electronic division of Visteon. Notwithstanding Kaye Scholer's alleged conclusion, but rather based upon the information and the evidence presented, the undersigned Arbitrator believes that those activities did not constitute a willful failure to carry out the reasonable and lawful directives of the Board nor did it rise to the level that would constitute a termination for cause under the Employment Agreement. Leuliette was acting, as he believed, in the best interest of Visteon and its shareholders and consistent with industry investment banking approaches. Finally, it was clear from the testimony provided that Laurie Ingram was paid significant amounts of salary and payments by Leuliette individually and/or Leuliette Partners. There is no and there has been no testimony provided that Laurie Ingram did not perform all of the tasks provided or assigned to her as the personal assistant to the CEO of Visteon, because of her other responsibilities. While certainly the relationship raised eyebrows and some minor discord from other personal assistants, they also did not rise to the level of justifying a for cause termination.

8. Not only were the above claims insufficient reasons to justify a for cause termination, there was also insufficient testimony to demonstrate Leuliette's actions in these five areas were not conducted in good faith or with the reasonable belief that such acts were not in the best interests of Visteon. Quite the contrary, the testimony provided on behalf of Leuliette was such that it became clear that he believed that his actions were proper and appropriate and were for the benefit of Visteon. It is also clear that some, including many members of the Board of

7

Directors, disagreed with Leuliette's approaches. However, this is not enough to show a lack of good faith.

9. The investigations started by Visteon continued after December of 2015 and resulted, on May 16, 2016, with Visteon advising Leuliette not only was he being terminated for cause because of the prior alleged reasons for termination, but also adding claims of downloading pornography to company owned devices, posting obscene messages and pictures on social media, storing numerous obscene photographs or other inappropriate information on Visteon devices, repeatedly reviewing websites and including information regarding the solicitation of prostitutes and/or soliciting prostitutes and claims of violations of ethics and integrity policy relating to the alleged Double Tiger transactions which predated his ascension to the position of CEO.[1] These pornography related allegations were supported by graphics and expert testimony and the undersigned finds that they clearly provide a justification for a termination for cause. It is also important to note that while no specific damage to Visteon has been offered into evidence, it is clear that this type of conduct would and could rise to a material violation of Visteon's rules, regulations, policies and/or restrictions regarding employee conduct. While Leuliette testified that this conduct did not reach the level as alleged by Visteon, it was clear these activities did utilize Visteon devices. It is also clear that the Visteon devices were not turned over for investigation prior to his termination in June of 2015 and this behavior was not detailed for the Board until May of 2016 – nearly a year after the initial termination. As Arbitrator, I had to determine whether or not this after acquired information can be utilized to defend the claim brought by Leuliette for breach of contract. In doing so, the undersigned

---

[1] The undersigned believes that the Double Tiger issue is not pertinent to this action. This is not a defense to the claimed breach of the Employment Agreement and the testimony received does not rise to the level of a breach to justify a for cause termination.

8

reviewed the briefs submitted by the parties, appropriate Delaware and Michigan law, and other cases outside of Delaware that interpreted either Delaware or Michigan law. It is also important to note that Paragraph 8(c) of the Employment Agreement provides that upon termination for cause Visteon was required to pay or provide the "accrued benefits" to Leuliette. This obligation survives whether or not the termination is a for cause termination. Therefore, based upon the testimony, the exhibits, the briefs, and appropriate laws in such case made and provided, it is the undersigned Arbitrator's finding that such after acquired evidence can be used to "shield" an employer from liability or "limit" available relief where, after the termination, the employer learns, for the first time, about employee wrongdoing that would have resulted in the employer discharging the employee for cause. The doctrine of using after acquired information as a shield is not applicable to the claims outlined in the letters of October 2, 2015, November 3, 2015 and December 3, 2015 and the Double Tiger matter. These claims were known or could have easily been discerned prior to Leuliette's termination in June of 2015. However, the May 16, 2016 letter identifying the conduct relating to his sexual behavior, which was not known in June or November of 2015, can be utilized to limit the relief available to Leuliette. While Leuliette claims that the offending material on Visteon devices was as a result of "syncing" his home computer with his Visteon devices, this claim is not credible. He was the person who requested the "syncing" and there is sufficient evidence of his using the various Visteon devices while on Visteon business trips to the Far East. A CEO of a major stock exchange company has a high moral standard to uphold and this conduct was inconsistent with that standard as well as the written policies of Visteon. The threat of exposure of this conduct for such a CEO is damage enough. Once the materials "graced" Visteon provided devices any alleged privacy considerations were no longer applicable or greatly weakened.

9

10. Leuliette's claim for breach of contract was based upon Visteon's failure to pay his benefits on termination, failure to provide him with notice and opportunity to cure a termination for cause, and the earlier termination without cause prevented Visteon from terminating him for cause. Visteon has counterclaimed alleging breach of contract, fraud in the inducement in entering into the Employment Agreement, Fraud Regarding Delaying the Termination and Terminating Him Initially Without Cause, Fraud as the CEO, Fraudulent Concealment as President and CEO, Equitable Fraud, Negligent Misrepresentation, and Breach of Fiduciary Duty as an Officer. With regard to Visteon's counterclaims, it is the undersigned's belief that there has not been a sufficient showing of evidence to identify a breach of contract that occurred prior to Leuliette's termination without cause. Therefore, the undersigned finds that the claim for breach of contract has not been established sufficiently to render an award in Visteon's favor. Furthermore, with regard to the fraud claims the undersigned, based upon the testimony, exhibits, and the law in such case made and provided, does not find that there was any intentional concealment, or even negligent concealment. In fact, if anything, much of the information Visteon claims to have relied upon in firing Leuliette either was or would have been available to Visteon if they performed a sufficient in-depth pre-contract investigation. This would have included litigation searches, as they testified was their normal and customary approach. Not only was Leuliette a member of the Board of Directors prior to becoming CEO, but, the Board testified they, in fact, did some investigation before his hire. They claimed, however, that because the Board believed they knew him based upon his performance as a Director of Visteon, as well as his approach and strengths, he was the best candidate available. They just elected, knowingly, to proceed. The issue of failing to disclose the prior claim against him for sexual harassment was one that had not been sufficiently established at the hearing. Yes,

there was a claim made against him which was settled. But, this all occurred prior to his becoming CEO. No questions were asked of him concerning such activities and they were not considered by the undersigned in connection with this matter. In short, the undersigned, based upon all of the information above and the evidence received during the hearings, believes that Visteon failed to establish the basis for and/or the amount of damages allegedly flowing from the claims set forth in the counterclaim and thereby the undersigned finds no cause for action with regard to same. However, because of the after acquired information previously discussed, Visteon can shield and therefore limit the damages owed by Visteon as a result of Leuliette's conduct.

11. Pursuant to the requirements of the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association, the aforesaid statements contained herein shall constitute the written reasons for the award below.

NOW, THEREFORE, the undersigned finds that the proofs submitted are sufficient to find that Visteon can support a "for cause termination" of Leuliette as a shield to minimize the amount of lost profits, damages, and benefits that Leuliette would have otherwise been entitled to. The undersigned Arbitrator holds that notice and the opportunity to cure the conduct related to the pornography and Leuliette's sexual activities which provide sufficient substantiation for a for cause termination, was of such a nature they would not have been susceptible to cure or was a repeated activity on the part of the employee. Therefore, the notice and cure provision are not applicable with regard to this conduct and thereby not "curable" and does not prevent Visteon's utilization of same to limit their exposure. However, notwithstanding same, and pursuant to Paragraph 8(c) of the Employment Agreement, the undersigned Arbitrator finds that Leuliette is entitled to receive and Visteon shall pay the "accrued benefits" to Leuliette that would have

vested on or prior to June 9, 2015. Therefore, Leucite's prorated bonus and lump sum cash payment for severance, replacement services, health and welfare in the claimed amounts of $50,000.00, $12,441.00, $649,041.10, $3,997,687.50 are hereby denied. Leucite's claimed RSUG and the PSUG amounts of $3,399,494.05 and $36,286,756.96 are also hereby denied. However, his claimed RSU dividend of $1,163,549.23 and his PSU dividend of $12,419,915.58 are hereby awarded to Leuliette. In addition, Leuliette's Retirement Savings Parity Plan, DC SERP Plan, and VC IP of $480,874.92, $1,385,157.31 and $127,612.96 are likewise awarded to Leuliette and to be paid by Visteon. Therefore, the aforementioned total sum of $15,577,110.00 shall be and is hereby awarded to Leuliette to be paid by Visteon together with interest thereon calculated at the rate of 5.75% on the dividends only which totals an additional $1,172,271.62 as of October 2, 2017 with a per diem thereafter at the rate of $2,139.86 until paid in full.

The administration fees of the American Arbitration Association totaling $46,620.00 and compensation and expenses of the Arbitrator totaling $59,413.09, shall be borne and incurred by Visteon as provided in Section 19 of the Employment Agreement. Therefore, Visteon shall reimburse Leuliette the sum of $5,600.00, representing that portion of the said fees and expenses in excess of the apportioned costs previously incurred by Leuliette.

Otherwise, each party shall pay all of its own costs and expenses, without limitation, including its own legal and expert fees and other expenses and no such legal and/or expert fees or expenses are hereby awarded to either party.

This award is in full settlement of all claims and counterclaims submitted to this arbitration and all claims not expressly granted herein are hereby denied.

I, Martin C. Weisman, duly affirm upon my oath as Arbitrator that I am the individual described and who executed this instrument which is my award.

_____
Martin C. Weisman, Arbitrator

Dated: _October 31_____, 2017.

F:\CLIENTS\M\American Arbitration 3218-M\Louliette v Visteon -8697\Award of Arbitrator.doc